## McCarthy *v.* Mann.

A., on the 13th of February, 1850, made an entry and location, which proved to be wholly void, of a land warrant on public land; and then conveyed to B. by deed with full covenants. B. conveyed to C. by a similar sort of deed; and C. conveyed to D., not by deed like the two just mentioned, but by a mere quit-claim; quit-claiming, however, all his right, title, &c., "both in law and equity, and as well in possession *as in expectancy.*" The Commissioner of the General Land Office cancelled the entry, &c., and set it aside as void; and A. took back his money. C. conveyed to D., and he to E., &c.
Congress now passed an act, enacting—

> "That the entry of A., &c., be and the same is hereby allowed and reinstated as of the date of said entry, so that the title to said lands may enure to the benefit of *his grantees as far as he may have conveyed the same:* Provided, that the money . . . shall be again paid at said land office, and that thereupon a patent shall issue in the name of said A. for said lands."

A. paid the money again, and got a patent reciting the act of Congress conveying the lands to him in fee.

C., after the passage of this act of Congress, conceiving that the two deeds with full covenants had by the process of estoppel vested him with a good title, but that his own deed of mere quit-claim had not vested his grantee, D., with any title through that means, or in any way, conveyed *de novo* to F. *Held,* That the act of Congress did vest him, through

the process of estoppel, with a full title, and that this title had passed by his conveyance, though but a quit-claim, to D.; and, of course, that this subsequent deed (the one to F.) passed nothing.

Aᴘᴘᴇᴀʟ from the Circuit Court for the District of Minnesota.

MᶜCarthy filed a bill in the court below against Mann (under a statute of Minnesota which enables any person claiming title to unoccupied land the title of which is claimed adversely to proceed in that way) to have the question of title to a piece of unoccupied land settled by the said court.

Both parties claimed under one French, in different ways, now to be mentioned.

The act establishing, in 1849, the Territory of Minnesota reserved certain sections of the public lands, to be surveyed, to the use of the public schools.

In 1850, one Peter Poncin, owning a warrant, caused the same, with the consent of the proper officers, to be located on a tract of the land thus reserved, and soon afterwards conveyed it by deed to one Pepin, his heirs and assigns, the deed being a deed of warranty, with the usual covenants "with the said Pepin, his heirs and assigns," and, among them, covenants that he, the said Poncin, was well seized in fee of the premises and had good right to sell and convey the same in manner and form aforesaid, and that he, the said Poncin, his heirs and assigns, would forever warrant and defend the said Pepin, *his* heirs and assigns, in the peaceable and quiet possession and enjoyment of all the said lands against any and all persons claiming, or who might claim, the same.

Pepin not long afterwards conveyed the land in fee to one French by deed of the same full, formal, and technical character as that just above described, by which Poncin had conveyed it to him, Pepin.

Soon after this, again, French made a deed of the land to one Elfelt. But the deed was not a deed like the preceding deeds; a deed with covenants, such as abovementioned, but

was a deed by which French " remised, released, and forever quit-claimed," and by the same did " remise, release, and forever quit-claim" to Elfelt, and " to his heirs and assigns forever," all his " right, title, interest, estate, claim, and demand, both in law and equity, and *as well in possession as in expectancy,*" to the land now in suit. The deed was, therefore, a deed commonly known as a " quit-claim," with, however, the special clause above italicized.

The warrant of Pepin, under which all these conveyances had been made, having been located on land reserved by the organic act of the Territory for schools, was of course void; and on the 10th of March, 1852, the Commissioner of the General Land Office set it aside.

Notwithstanding this, however,—and after the commissioner had set the location aside—Elfelt, the grantee last abovementioned, conveyed to one Van Etten; this deed, like French's deed to Elfelt himself, being a deed of quit-claim.

Whatever title, or other thing capable of being made into a title — if anything of either — was thus vested in Van Etten, became afterwards vested by sufficient deeds in Mann.

In this state of things—these different deeds of different sorts having been made, and the location on which they all rested having been void, and been set aside—Congress came in, and in July, 1854, by " An act authorizing a patent to be issued to Peter Poncin for certain lands therein described," enacted:

" That the entry by Peter Poncin of . . . [the land now in question, describing it], cancelled by the Commissioner of the General Land Office, *be, and the same is hereby, allowed and reinstated as of the date of said entry, so that the title to said lands may enure to the benefit of his grantees as far as he may have conveyed the same.*"

The act contained a proviso, that the money paid for said lands should not have been withdrawn, or, if withdrawn, should be again paid at the land office; and enacted that

thereupon a patent should issue *in the name of said Peter Poncin* for said lands.*

After the passage of this act Elfelt executed to Van Etten a further deed, the same being a deed of quit-claim.

And subsequently to this again, Poncin having paid into the land office the price of the lands which he had attempted to locate in 1850 with his warrant already mentioned, the United States (March 24th, 1855) issued to him a patent. The patent, reciting the act of Congress, proceeded thus:

"Now know ye, that the United States of America, in consideration of the premises, and in conformity with the several acts of Congress in such case made and provided, have given and granted, and by these presents do give and grant *unto the said Peter Poncin, and to his heirs*, the said tract above described, to have and to hold the same, together with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging, unto the said Peter Poncin, and to his heirs and assigns forever."

In this state of things French, who, it will be remembered, had received a deed with full covenants from Pepin—the said Pepin having himself previously received a similar deed from Peter Poncin—and which said French, thus, of course —if he had never made any conveyance of the land, would, on the issue of the abovementioned patent, have been invested with all Poncin's title, on the well-known common-law principle of estoppel—conceived that there was such a difference in the nature of the two deeds, with full covenants, just mentioned, which brought the title *to* him and the deed of simple *quit-claim*, which he had given to Elfelt, and which was the only deed that he had executed to pass any title *out* from him, that while the said doctrine of estoppel would apply to the former and vest him with the title given to Poncin, by the act of Congress and the patent, it would *not* apply to the latter, and therefore would *not* vest Elfelt or

---

* By the same act the superintendent of the public schools, in Minnesota, was authorized to select other lands in lieu of the section now as abovementioned disposed of.

anybody claiming under him with the title of Poncin, or, in other words, with the title of him, French.

He thereupon executed a second deed of quit-claim to an entirely distinct person, one Furber.

Under Furber, and through this last-mentioned deed of French, the complainant McCarthy claimed.

Under the previous one, to Elfelt, claimed, as already said, the defendant Mann.

The court below dismissed the bill and the complainant took this appeal.

*Mr. W. P. Clough, for the appellant:*

Of course neither Poncin, nor any person claiming under him, had any interest whatever in the lands until Poncin's entry of them under provision of the act of 1854, and at the date of the passage of that special act, the United States continued to have as absolute ownership as it ever had. This being so, our position is that upon the entry of the lands by Poncin, under the special act, the title immediately passed from him to Pepin, and from Pepin to French; and remained in the latter until conveyed to Furber in 1856.

At the time of the entry by Poncin, under the act of 1854, Pepin was owner of the covenant of warranty contained in his deed from Poncin, and French was owner of that contained in his deed from Pepin. Neither of such covenants ever became annexed to the land; that is to say, never ran with it; because to run with lands, that is, to pass under bare mention in the deed of the land itself, the covenants must be made by or with persons who are owners of the land, or of some estate therein. This is very ancient law; the leading case being from the Year-book of 43d Edward III, 3, cited in *Spencer's Case.** The existence of the same rule was affirmed in *Noke* v. *Awder*,† which has usually been cited as the leading case upon the point that only covenants made with the owner of the land run with

---

* 5 Coke, 16; 1 Smith's Leading Cases, 116.    † Croke Elizabeth, 373.

it; but erroneously, for the case from the Year-books had established the doctrine two centuries before.

Nor will this case fall within *Slater* v. *Rawson** and *Beddoe* v. *Wadsworth*,† which have introduced into this country a rule not recognized by the English courts, that when the covenanter has *actual possession* of, though no valid title to, the lands to which the covenant relates, and acting under the deed containing such covenant, transfers actual possession to the covenantee, then the covenant will pass to a subsequent transferee of the land by the covenantee. For here any occupation of the lands in question, prior to their entry under the act of 1854, would have been in direct and inexcusable violation of law. Independently of which, possession by any one from whom either of the parties derives title, is not pretended to have existed prior to the entry of Poncin in 1854.

Neither Poncin, Pepin nor French was under any manner of obligation to Elfelt, nor to any one claiming under him, in regard to the lands, for French's deed was a mere release, operating only upon his then present interest, which was zero. It contained no averment of title, and no covenant, whereby French became bound as to the future.

What then became of the title after its passage from government?

That it went to Poncin is clear. That it did not remain *in* him is equally clear. In whom then did the law, by its own operation, immediately vest it?

The ordinary legal effect of the covenants of warranty which Pepin and French respectively held, cannot be open to dispute. By virtue of their operation, Poncin's estate at once enured to, and vested in, Pepin; and Pepin's estate, so received from Poncin, at once enured to, and vested in, French. This is the old common-law rule of estoppel.

But, when the title had thus arrived in French, it remained in him, from want of any relations to Elfelt upon which the law could operate to carry it to him. As has

---

* 1 Metcalf, 450.     † 21 Wendell, 120.

been before remarked, French was under no obligation as to Elfelt's title in the land. He had not covenanted to protect Elfelt's title, and he had not professed, in his deed to Elfelt, either to have or to transfer any interest whatever in the lands. Now no rule of law is better settled than that subsequently acquired interests are wholly unaffected by deeds of mere release without covenants, or without recitals of estate in the grantor.*

Since, then, the operation of ordinary legal principles failed to carry the title any further than to French, it must have remained in him until he granted it away, by sufficient deed of conveyance; such deed he did not make till he made his deed to Furber, in 1856.

"But," it may be asked, "did the ordinary rules of law, in fact, govern in this case?" Certainly they did; for the statute gave no direction whatever to the passage of the title, after its arrival in Poncin. Even the clause of the statute providing that "the entry of Peter Poncin," be allowed and *reinstated as of the date of said entry*, cannot be made the basis of a contrary argument. Ordinary legal principles were left even by this clause free to accomplish their usual results, unless Congress not only meant the proposed transfer to relate back to the time of the location in 1850, but by the clause actually did make it relate back to that very time and be of the very same effect in law, for every purpose, and as between all persons, as if the location had been legally perfected at that date; in other words, unless by the clause all parties interested and the courts were estopped from saying that title did not *in fact* pass to Poncin in 1850.

The act did not purport to burden Poncin's title with equities or trusts in favor of any specified person. The statement that allowance of the entry is made so that the title may enure to the benefit of Poncin's grantees, does not declare a use in favor of any particular claimant of the land, in preference to any other.

* Van Rensselaer v. Kearney, 11 Howard, 322; Rawle on Covenants for Title, 4th edition, 390, 391, and cases cited.

The clause did not have a literal and retroactive operation. If it had, its effect would have been to clothe the patent issued under it in 1854 with the same legal consequences that would have attended one lawfully issued in 1850. Such a result could have been accomplished only,

1st. By the statute acting by way of ratifying a void act done in the name of the United States by one having no authority at the time; or,

2d. By the statute acting by way of saying that the rights of *all* persons should be under this patent precisely what they would have been if the attempted location had been effectual, and a patent had issued upon it.

But Congress is powerless to enact, with effect, that title to any property at the time actually vested in the United States was transferred by the latter years before; and to argue that it could, would be to propound a manifest absurdity. Congress is equally powerless to enact with effect, to-day, that a designated person may have a patent of some parcel of land in which none but government has any spark of interest, and that upon the issue of such patent to-morrow the land shall have been the property of the patentee for the four years past. Therefore the statute produced no retroactive results by virtue of its operating upon facts themselves, and changing them from what they really were.

It did not operate by way of ratifying any previous void act of Poncin and of the land officers. The act did not propose to allow or to reinstate the only thing which had actually been done. It was not designed nor permitted that the location of the land warrant should now be made, which the law had before rejected. If Poncin had, after the passage of this special statute, repossessed himself of his old land warrant, and offered to locate it upon these lands, he could not have done it. The only thing which the act did authorize, was an entirely new and original transaction, wholly unconnected with anything that had been essayed in the past. The dissent, therefore, by the United States to all that had been done by Poncin and its officers, in rela-

tion to these lands, was continued by the act, in full and unmodified force.

The act did not operate by way of making the rights of the parties, other than Poncin, what they would have been at the date of the passage of the law, if the attempted acquirement of the lands by Poncin in 1850 had been consummated at that date.

Congress was prohibited by the Constitution from granting the lands to Poncin, and then saying that the rights of the other parties should be what they would have been had the location in 1850 been effectual. For, with the covenants in full force, the title, when vested in Poncin, would instantly pass through Pepin to French; and to take it from the latter by statute, would be to deprive him of his property in a way not permitted by the rules of constitutional law.

It will be no answer to these positions to argue that the lands were government's, and that therefore it was free to grant them to whomsoever it should choose. For although the government by its statute declared that it exercised its proprietary right of disposition of the lands, so that the title vested by it in Poncin might enure to the benefit of his grantees, in so far as he might have conveyed the same, it omitted to state which of the several parties claiming to stand in that relation was the one intended. It did not even undertake to say that any part of the land had been conveyed, much less to decide whether French with his covenants, or Elfelt without any, and holding a mere release applying to no future interests, was the person to whom the title, with which it was parting, should ultimately move. Congress plainly meant that whoever should get title after Poncin, should get it by the laws of the land, and did not mean to assume the task of itself settling and adjusting the conflicting claims of those deriving title from him.

The insurmountable difficulty with the defendant's title is, that it would force a construction upon this act that would give to a mere quit-claim deed, having no covenants nor averments of title, equal efficacy with a deed having

covenants, to pass subsequently acquired estates. To add to such a deed by special statute, the quality which it did not possess when made, of passing after-acquired interests, would not only be in conflict with the constitutional provisions protecting vested rights of property, but would be unjust and oppressive.

No estoppel has arisen to bar or conclude French, or any claiming under him through the Furber deed, from averring the truth. The essence of estoppel is, that the person estopped has done some act, or made some assertion, which good conscience or fair dealing would prevent him from afterward denying. If the complainant was estopped from asserting anything, it was either that Poncin had not title in 1850, or that he had not title in 1851, when he quitclaimed to Elfelt. And if such estoppel arose at all, it was upon his deed to Elfelt, because that is the only transaction between them of any consequence in determining that question. That deed, however, contained no averment of title, and no covenant, and consequently no statement capable either of being denied or affirmed. It is settled that a deed of that character works no estoppel whatever upon the grantor.*

The only other act which French ever did in relation to the land, before Elfelt took his deed, was his acceptance of the deed from Pepin. But that did not conclude him from denying, even as between himself and Pepin, that Pepin had nothing at the date of the deed in the lands, although that instrument contained full covenants.†

But, in addition to there having been nothing in law to estop the complainant, there was not even anything in his asserting title inconsistent with the highest degree of good conscience and fair dealing, as a mere moral question. Those who have dealt in the title here set up by the respondents have done so with all the facts upon which the appellant relies to sustain his title, spread out upon the stat-

---

* Van Rensselaer *v.* Kearney, 11 Howard, 322.

† Sparrow *v.* Kingman, 1 New York, 242.

ute-books of the United States and upon the records of the county where the lands are situated.

*Mr. H. J. Horn, contra.*

Mr. Justice SWAYNE recapitulated the facts of the case, and delivered the opinion of the court.

The appellant, under a remedial statute of the State, filed the bill to enforce his claim of title to the real estate in controversy. The court below decreed against him, and he thereupon brought the case to this court by appeal for review. The facts, so far as it is necessary to state them, are as follows:

The premises were a part of the public domain of the United States. On the 13th of February, 1850, Peter Poncin entered at the proper land office a tract of a hundred acres. The premises are a part of that tract.

On the 28th of March, 1850, Poncin conveyed the entire tract to Pepin, by deed of warranty. On the 19th of April, in the same year, Pepin conveyed with warranty to French. On the 19th of March, 1851, French, by deed of quit-claim, conveyed all his right, title, and claim, "both in law and in equity, as well in possession as expectancy," to Elfelt.

On the 10th of March, 1851, the Commissioner of the General Land Office set aside Poncin's entry, upon the ground that the section in which the land was situated was reserved by the act of March 3d, 1849, for school purposes.

On the 15th of October, 1853, Elfelt conveyed, by deed of quit-claim, to Van Etten.

On the 27th of July, 1854, an act of Congress was passed whereby the entry of Poncin was reinstated, and it was enacted that upon the payment of the purchase-money a patent should issue to him.

On the 19th of October, 1854, Elfelt executed to Van Etten a further deed of quit-claim. On the 24th of October, 1854, Van Etten, by deed of quit-claim, conveyed the undivided half of the tract to Robertson. On the 31st of the same month, Poncin paid into the land office the price of

the land, and on the 24th of March, 1855, the United States issued to him a patent for it. On the 22d of July, 1855, Robertson and Van Etten laid the tract out into lots and platted them as an addition to the city of St. Paul. This addition is now worth more than half a million of dollars. The lots and blocks of lots in controversy are parts of this addition. All the deeds beforementioned were duly executed and recorded. .

On the 14th of January, 1856, French conveyed, by deed of quit-claim, the entire tract to Furber. On the 28th of June, 1856, Furber conveyed by a like deed to Dunn. On the 31st of July, 1856, Dunn executed a like deed to Hammond, and on the 20th of September, 1862, Hammond a like deed to McCarthy, the appellant. The deeds to Furber and Dunn were duly recorded. Those to Hammond and the appellant have never been recorded.

The act of Congress under which the second entry of Poncin was made, is as follows: .

" An act authorizing a patent to be issued to Peter Poncin, for certain lands therein described.

" Sec. 1. *Be it enacted,* That the entry by Peter Poncin of the north half of the southeast quarter and the south half of the northeast quarter of section thirty-six, in township number twenty-nine, of range twenty-three, in Stillwater land district, Minnesota, cancelled by the Commissioner of the General Land Office, *be, and the same is hereby, allowed and reinstated as of the date of said entry, so that the title to said lands may enure to the benefit of his grantees as far•as he may have conveyed the same;* provided, that the money paid for said lands shall not have been withdrawn, or, if withdrawn, shall be again paid at said land office, and that thereupon a patent shall issue in the name of said Peter Poncin for said lands.

" Sec. 2. *And be it further enacted,* That the superintendent of public schools in said Territory of Minnesota, be, and he is hereby, authorized to select other lands in lieu of said section thirty-six, as far as the same have been granted or sold."

The first entry by Poncin was clearly void, and the commissioner was right in setting it aside. When the act in question was passed, the United States held the land as if no entry had been made. Being the absolute owners, they could grant it upon such terms and conditions as Congress might prescribe. The government united the powers of ownership and legislation, and both were exercised in passing the act. The act declared, first, that the entry should be reinstated as of its original date, and that a patent should issue to Poncin; second, that the title should enure to the benefit of his grantees as he should have conveyed the land. The law is explicit and there is no difficulty in carrying out its provisions. It must be liberally construed to effect the purposes of its enactment. By Poncin's grantees was meant those claiming title under him. Those to whom he might have conveyed were no more intended to be beneficiaries under the act, than those holding remoter links in the same chain of title. When he paid his money and procured a certificate of entry pursuant to the act, an equity vested in each of those who would have held it, if the original entry had been valid, and when the patent issued, the legal title vested in the same parties. The act applied the doctrine of relation. It made no distinction between grantees with warranty and those without it. If there had been outstanding title-bonds, they also would have been within the equity of the act, and the holders could have enforced them accordingly. The law and equity of the case are with the appellees, and the decree of the Circuit Court is

AFFIRMED.