## DUNN et al. v. BARNUM et al.

(Circuit Court of Appeals, Eighth Circuit. July 19, 1892.)

### No. 105.

1. PUBLIC LANDS—MILITARY LAND WARRANT—LOCATION ON SCHOOL LANDS.
The location of a military warrant upon land which has already been reserved by act of congress for school purposes is void, and neither the locator nor his grantees can acquire any legal or equitable rights thereunder to the land.

2. SAME—EFFECT OF CURATIVE ACT.
Act July 27, 1854, required the reinstatement of an entry by one P. under a military warrant of certain land, theretofore canceled by the commissioner of the general land office, "so that the title to said lands may inure to the benefit of his grantees as far as he may have granted the same," provided that the money paid therefor, if withdrawn, should again be paid, and that a patent should thereupon issue to him. Held, that on the subsequent payment by P., and the issuance of a

patent to him, the title related back to the date of the first entry, and he and his grantees were thereby vested with the same title as they would have severally possessed had the first entry been valid.

3. SAME.

The act vested title in a remote grantee by a quitclaim deed of part of the lands, though the existing record of the deed by mistake omitted part of the land from the description.

4. VENDOR AND VENDEE — BONA FIDE PURCHASERS — INADEQUATE CONSIDERATION — PRESUMPTIONS.

One who receives a deed of bargain and sale conveying lands worth $30,000 for a consideration of $100 must be presumed to know of infirmities in his grantor's title, and cannot claim the protection of the rule in favor of innocent purchasers, as against one holding for value under a prior deed, in the recording of which the land in question was omitted by mistake.

5. SAME—QUITCLAIM DEED.

In 1856, and until the law was changed by the act of 1875, it was the settled rule in Minnesota that one claiming under a quitclaim deed could not invoke the rule in favor of *bona fide* purchasers without notice of defects in title.   *McDonald v. Belding,* 12 Sup. Ct. Rep. 892, 145 U. S. 492, distinguished.

Appeal from the Circuit Court of the United States for the District of Minnesota.    Affirmed.

Statement by CALDWELL, Circuit Judge:

This suit was brought by Augustus K. Barnum on behalf of himself and numerous other persons who joined with him, in the state court, under section 4, c. 75, Gen. St. Minn. 1878, p. 814, to remove a cloud from, and quiet the title to, the lands described in the bill.    The defendants removed the suit to the circuit court upon the ground of diverse citizenship.    An answer was filed and much testimony taken, and on the final hearing the court below rendered a decree in accordance with the prayer of the bill, and the defendants appealed.

It would serve no useful purpose to set out at length the testimony in the case.    It is sufficient to say that, upon a careful consideration of the pleadings, stipulations, and evidence, we find the following facts:

That on the 13th day of February, 1850, Peter Poncin located a military land warrant on the N. ½ of the S. E. ¼, and the S. ½ of the N. E. ¼, of section 36, township 29 N., of range 23 W., in the district of land subject to entry at Stillwater, Minnesota territory, containing 160 acres, and received from the proper officers of the United States land office a certificate of such location and entry.    The premises in controversy are a part of that tract, to wit, the S. W. ¼ of the N. E. ¼ of said section.    On the 28th day of March, 1850, said Peter Poncin, for the consideration of $150, conveyed the S. ½ of the N. E. ¼, except 20 acres off the east end thereof, and the N. ½ of the S. E. ¼ of section 36, township 29 N., of range 23 W., to Antoine Pepin by deed containing the usual covenants of warranty, which deed was duly recorded on the 2d day of April, 1850.    On the 29th day of March, 1850, said Antoine Pepin, for the consideration of $100, conveyed the N. W. ¼ of the S. E. ¼, the S. W. ¼ of the N. E. ¼, and the W. ½ of the S. E. ¼ of the N. E. ¼, in the section, township, and range aforesaid, to Alpheus R. French, by deed containing the usual covenants of warranty, which deed was duly recorded on the 15th day of January, 1851.    On the 19th day of April, 1850, the said Alpheus R. French executed and delivered to Louis C. Elfelt and Charles D. Elfelt a bond for a deed, whereby he

agreed to convey said land last described to said Elfelts for the consideration of a stock of saddlery and harness, valued at $500, which bond was recorded on the day of its date. The said Louis C. and Charles D. Elfelt paid for said lands in a mode satisfactory to said French, and thereupon the said French, on the 19th day of March, 1851, executed, acknowledged, and delivered to said Elfelts a quitclaim deed for said lands, which deed was duly filed for record March 20, 1851; but, by a clerical mistake of the register of deeds, said deed was not accurately and truly recorded at that time. The error in recording said deed consisted in this : Among the lands conveyed by said deed, and properly described therein, was the S. W. ¼ of the N. E. ¼ of the section, township, and range aforesaid, being the land here in controversy, but in recording said deed this 40-acre tract was omitted, so that the record thereof did not show, as it should have done, that this tract was a part of the land conveyed by said deed. Subsequently the mistake in recording this deed was discovered, and on the 4th day of February, 1857, said deed was again filed for record, and duly recorded. The complainants, through sundry mesne conveyances, are the grantees of the said Charles D. and Louis C. Elfelt of the lots and parcels of land claimed by them respectively, and which are situated upon, and in the aggregate comprise all of, the said S. W. ¼ of the N. E. ¼ of said section 36. Said 40-acre tract was laid out into lots, blocks, streets, and avenues, and the plat thereof duly recorded years ago, and it now constitutes a part of the city of St. Paul, and is occupied by a large population, who purchased and paid full value for their lots, and have in good faith made lasting and valuable improvements, and paid the taxes thereon. The aggregate value of their several holdings is from $600,000 to $1,000,000.

Before Poncin's location and entry, the section in which the land was situated was reserved by act of congress for school purposes, and Poncin's entry was therefore void, and was for that reason set aside by the commissioner of the general land office on the 10th day of October, 1852. On the 27th of July, 1854, congress passed the following act :

"An act authorizing a patent to be issued to Peter Poncin for certain lands therein described. Be it enacted by the senate and the house of representatives of the United States of America, in congress assembled, that the entry by Peter Poncin of the north half of the southeast quarter, and the south half of the northeast quarter, of section 36, in township number twenty-nine, of range twenty-three, in the Stillwater land district, Minnesota, canceled by the commissioner of the general land office, be, and the same is hereby, allowed and reinstated as of the date of said entry, so that the title to said lands may inure to the benefit of his grantees, as far as he may have conveyed the same: Provided, that the money paid for said land shall not have been withdrawn, or if withdrawn shall be again paid at said land offices, and that thereupon a patent shall issue in the name of said Peter Poncin for said land. Sec. 2. And be it further enacted that the superintendent of public schools in said territory of Minnesota be, and is hereby, authorized to select other lands in lieu of said section thirty-six, as far as the same has been granted or sold. Approved July 27, 1854."

In compliance with the proviso of this act, Poncin paid into the United States land office the price of said land, and on the 24th day of March, 1855, a patent was duly issued to him for the same under and

in pursuance of said act of congress. After the passage of this act of congress, French, conceiving that it gave him some right to the land, notwithstanding his previous conveyance of the same to the Elfelts, on the 14th day of January, 1856, conveyed the land to Pierce P. Furber, by deed of bargain and sale, for the expressed consideration of $100. French was not acquainted with Furber, and did not see or have anything to do with him, personally, in this transaction. One Gibbs acted as agent for Furber in procuring this conveyance from French, and knew before and at the time he procured the conveyance to be made that French had previously conveyed the land to the Elfelts. The agreement between Gibbs, acting for Furber, and French was that French and Furber would divide "the spoils of this ground when they did get a title to it." Subsequently Gibbs, acting for Furber, agreed to pay French $100, but that sum was not paid, and Furber never paid anything for the land. At the date of this conveyance the land embraced in it was worth $30,000. On the 28th day of June, 1856, Furber, for the expressed consideration of $150, conveyed the land by deed of quitclaim to John P. Dunn. At the date of this conveyance, the land embraced in it was worth $50,000. It will be seen that French is the common source of title of both parties to the suit, the complainants claiming under and through the deed of French to the Elfelts made in 1851, and the defendants, who are the heirs of Dunn, claiming under and through the deed from French to Furber made in 1856, and the deed from Furber to their ancestor made the same year.

*Charles N. Hunt, Frank H. Morrill,* and *George H. White,* for appellants.

*Davis, Kellogg & Severance,* (*Frank B. Kellogg,* of counsel), for respondents.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge:

CALDWELL, Circuit Judge. The original entry by Poncin was void, and in virtue of that entry neither he nor his grantees acquired any legal or equitable right or title to the land. But the act of congress provided that, when Poncin paid the entrance money pursuant to the requirements of the act, the first entry should be "allowed and reinstated as of the date of said entry, so that the title to said lands may inure to the benefit of his grantees so far as he may have conveyed the same." When Poncin paid the entrance money and received a patent under this act, the title related back to the date of the first entry, and he and his grantees, however remote, were thereby vested with the same right and title to the land which they would have severally possessed had the first entry been valid. "The act applied the doctrine of relation. It made no distinction between grantees with warranty and those without it," and title bonds were held to be within its equity. *McCarthy* v. *Mann,* 19 Wall. 20, 2 Dill. 441.

The defendants' contention is that French never conveyed the land to the Elfelts, or that, if such a conveyance was made, it was not recorded when French conveyed to Furber, and that Furber was a purchaser for

value without notice, and as such could and did convey a good title to Dunn; and that, if this be not so, Dunn himself was a purchaser from Furber for value without notice of any infirmity in the title. We find the fact to be that before the passage of the act of congress French had conveyed the land to the Elfelts, and the act, therefore, vested the title in the Elfelts and their grantees. It is true, the deed from French to the Elfelts, by reason of a mistake of the recorder in recording it, was not, at the date of the passage of the act of congress, on record, so far as it related to the land here in controversy. But the operation of the act of congress was not restricted to such grantees of Poncin as had recorded their deeds. The deed had been duly executed, and was as effectual to vest the title in the Elfelts as if it had been duly recorded. It was subsequently duly recorded. There is abundant evidence to show that the last record of the deed expresses truly its contents as it was originally executed. Both records of the deed state that it conveys 100 acres, but the particular description of the land in the first record only gives 60 acres, thus showing an omission of one 40. The land conveyed by the deed, according to the second record of the same, is the land which French had bound himself by title bond to convey to the Elfelts, and French himself testifies that he did convey the land that he sold to the Elfelts and which was described in his bond. For a discussion of the rules applicable, where there are two records of the same deed, which differ in a material respect, see *Stinson* v. *Doolittle*, 50 Fed. Rep. 12. The deed from French to Furber was made before the deed from French to the Elfelts was accurately recorded, but not before the act of congress had vested the title in the Elfelts and their grantees.

It is undoubtedly true that under the operation of the registration laws one may sell and make good a title to land which somebody else owns. If the seller appears to be the owner of record, the purchaser has a right to assume that the record title is the true title, and when he pays value, and has no notice, actual or constructive, of the previous conveyance of the land by his vendor, he acquires a good title. Applying the registration laws of this state to the titles acquired by Poncin's grantees under the act of congress, we proceed to inquire whether Furber, and Dunn, the defendants' ancestor, or either of them, were purchasers in good faith and for value without notice. Furber, through his agent Gibbs, had full knowledge of the fact that French had previously conveyed the land to the Elfelts. The transaction between French and Gibbs, acting for Furber, which ended in French executing a deed to Furber, was, according to the testimony of French himself, simply and purely a scheme to defraud the Elfelts and their grantees out of this land. The testimony of French on this point is full and conclusive.

But, independently of French's testimony, the bad faith of the transaction is apparent upon the face of the deed when the value of the property is considered. The consideration expressed in the deed is $100, and at the time the deed was executed the land was worth $30,000, with a prospect of a rapid increase in value, and it is now worth $1,000,000 or more. However it may have been in past ages, it is certain that in

this age, when capital is so abundant and dealers in land so numerous. and eager to purchase wherever the investment gives promise of a profit, no man can openly acquire in the market, at private sale, a good and unimpeachable title to $30,000 worth of land for $100 without exciting the gravest suspicions as to his good faith and the honesty of the transaction. It would seem that one could not purchase land worth $30,000 for $100 without a well-grounded suspicion either that the seller was insane or that his title was bad. In the judgment of all mankind—and there is no surer guide to the right than the universal *consensus* of opinion among men—such a transaction, unexplained, implies a bad title or bad faith. The instant such a conveyance is set up as evidence of a purchase in good faith and for value of a sound title, the inference is irresistible that it was procured by fraud or for a fraudulent purpose. Such a conveyance passes the legal title, and may be good between the parties as a gift, or as a conveyance to remove a cloud from the title, or as a sale of a confessedly doubtful and disputed title, and for such like purposes; but when it is set up and relied on under the registration laws of the state as a means of taking lands from the real owner, because, and only because, his deed was not recorded, it will not be accepted as sufficient evidence that the vendee paid a valuable consideration and purchased without notice, either actual or constructive, or a well-grounded suspicion that his vendor had no title. A valuable consideration, actually paid, is an essential requisite. In the sense of this rule, as applied to this class of cases, the consideration expressed in the deed to Furber is not a valuable one. The same sum of money is not equally a valuable consideration in all cases. Whether it is so or not depends on the relation it bears to the value of the property claimed to have been purchased with it. When the consideration is infinitesimal, merely nominal, compared to the value of the property, it will not be accepted as a valuable consideration by a court of equity, as against one claiming under a prior unrecorded deed. The enormous discrepancy between the consideration expressed in this deed and the value of the land compels the conclusion that the grantee knew, or, what is the same thing in legal effect, had good reason to believe, there was a fatal infirmity in the title he was acquiring, and so was not a purchaser in good faith. At that time numerous satisfactory sources of information were open to any one desirous of learning the facts about the title to this land. One put upon inquiry and seeking the truth could not have failed to learn the facts. An offer to sell land worth $30,000 for $100 was enough to arouse suspicion and excite inquiry in the most lethargic mind, and if inquiry was not made and the facts not learned it was because the purchaser deliberately and purposely abstained from doing so, to avoid the actual knowledge of facts he with good reason believed to exist, and this is the legal equivalent of actual notice. *Hume* v. *Franzen*, (Sup. Ct. Iowa, 1887,) 34 N. W. Rep. 490; *Knapp* v. *Bailey*, (Sup. Jud. Ct. Me. 1887,) 9 Atl. Rep. 122; *Gaines* v. *Saunders*, (Sup. Ct. Ark. 1888,) 7 S. W. Rep. 301; *Hoppin* v. *Doty*, 25 Wis. 573.

The deed from Furber to Dunn is infected with all the infirmities of that from French to Furber, and one additional fatal vice of its own. The land conveyed by this deed was worth at the date of the conveyance $50,000, and the consideration expressed in the deed is $150, and even this sum is not shown to have been paid, by any competent evidence. The effect of this mere peppercorn consideration compared to the value of the land has been considered in discussing the deed from French to Furber, and needs no further consideration. But the deed from French to Furber was one of bargain and sale, while the deed from Furber to Dunn is a mere deed of quitclaim. This quitclaim to Dunn was executed in 1856. It was then the settled law in this state that one claiming title by a quitclaim deed could not be regarded as a *bona fide* purchaser without notice; that a deed of that character passed the title as the grantor held it, and that the grantee took only what the grantor could lawfully convey. *Martin* v. *Brown*, 4 Minn. 292, (Gil. 201;) *Hope* v. *Stone*, 10 Minn. 141, (Gil. 114;) *Everest* v. *Ferris*, 16 Minn. 26, (Gil. 14;) *Marshall* v. *Roberts*, 18 Minn. 405, (Gil. 365.) These decisions are obligatory on this court in this case, and they put an end to the defendants' claim under the Dunn deed. The doctrine of the Minnesota supreme court in the cases cited is in harmony with the general, and almost uniform, doctrine of the cases on this subject. *McCarthy* v. *Mann*, 19 Wall. 20; *Prentice* v. *Stearns*, 113 U. S. 435, 5 Sup. Ct. Rep. 547; *Oliver* v. *Piatt*, 3 How. 405; *Gest* v. *Packwood*, 34 Fed. Rep. 369; *McClung* v. *Steen*, 32 Fed. Rep. 374; *May* v. *Le Claire*, 11 Wall. 217; *Griswold* v. *Bragg*, 6 Fed. Rep. 342; *Dickerson* v. *Colgrove*, 100 U. S. 578; *Baker* v. *Humphrey*, 101 U. S. 499; *Hastings* v. *Nissen*, 31 Fed. Rep. 597; *Bragg* v. *Paulk*, 40 Me. 516; *Nash* v. *Bean*, 74 Me. 340; *Vattier* v. *Hinde*, 7 Pet. 269; *Watson* v. *Phelps*, 40 Iowa, 482; *Johnson* v. *Williams*, 37 Kan. 179, 14 Pac. Rep. 537.

The rule as to the effect of a quitclaim deed was changed in Minnesota by statute in 1875, (*Strong* v. *Lynn*, 38 Minn. 315, 37 N. W. Rep. 448,) but the act was not retroactive, and it is not claimed that it had any effect on the rights of the complainants and their grantors, who acquired their title and whose deeds were on record long before the act was passed. See *Gaston* v. *Merriam*, 33 Minn. 271, 22 N. W. Rep. 614. In Arkansas one holding under a quitclaim deed is not precluded from showing that he paid full value, and is in fact a purchaser in good faith. *McDonald* v. *Belding*, 145 U. S. 492, 12 Sup. Ct. Rep. 892. This case rested on special grounds. There was good faith in fact, and the odious feature of a nominal consideration was absent, the purchaser having paid full value for the property in cash. But in that state it is held that where "a person bargains for and takes a mere quitclaim deed, or deed without warranty, it is a circumstance, if unexplained, to show that he had notice of imperfections in the vendor's title, and only purchased such interest as the vendor might have in the property." *Bagley* v. *Fletcher*, 44 Ark. 153, 160; *Miller* v. *Fraley*, 23 Ark. 735, 740. In *Gaines* v. *Saunders*, 50 Ark. 322, 7 S. W. Rep. 301, Judge BATTLE, speaking for the court, said:

"The evidence shows that the lands in controversy cost about six thousand dollars, and that there was loaned on them as security two thousand two hundred and twenty dollars. The deed executed by Whittaker to Mrs. Saunders was a quitclaim deed and was recorded, and it states that the consideration received for the lands was five dollars. Was not this fact sufficient to put any prudent man on inquiry? Is it possible that any sane man, having good title to land worth two thousand or six thousand dollars, would sell it for five dollars? The question suggests its own answer. Add to this the fact that the conveyance executed was a quitclaim deed, and the conclusion that Mrs. Saunders did not acquire a good and valid title, in the absence of an explanation, would be irresistible. It was at least sufficient to have put appellants on inquiry, which, if they prosecuted with ordinary diligence, would doubtless have led to actual notice of the facts as shown by the evidence in this case. But they prosecuted no inquiry, and it follows that they are not *bona fide* purchasers without notice."

Furber having no title, his quitclaim to Dunn passed none. As the defendants never had any title to lose by laches, it is unnecessary to consider that question. The decree of the circuit court is affirmed.