## CHADWICK v. ARNOLD et al.

No. 1841.   Decided April 4, 1908   (95 Pac. 527).

1. TRIAL—FINDINGS OF COURT—SUFFICIENCY—CONCLUSIONS—FINDINGS OF FACT—SEPARATE STATEMENT OF. In an action to have the holder of the legal title of certain real estate adjudged a mere holder of the title in trust for plaintiff's benefit, by reason of a verbal contract entered into between plaintiff and the person from whom, with notice, defendant acquired his title whereby such person agreed to convey the realty to plaintiff upon receipt of a certain sum, a finding that no enforceable contract existed between the plaintiff and such person was insufficient under Revised Statutes 1898, sec. 3169, requiring that the facts found and the conclusions of law be separately stated.

2. VENDOR AND PURCHASER—BONA FIDE PURCHASERS—NOTICE—EVIDENCE. In an action to have the holder of the legal title of certain real estate adjudged to hold it in trust for plaintiff, evidence examined, and *held* to show that defendant acquired the title to the property with actual notice of plaintiff's rights.

3. FRAUDS, STATUTE OF—CONTRACTS WITHIN—ORAL CONTRACTS—SALE OF LAND. A mere oral agreement to purchase land from another is within the statute of frauds.

4. TRUSTS—CONSTRUCTIVE TRUSTS—RESULTING TRUSTS—CONTRACTS CREATING. Where a person having no interest in certain real estate orally agrees with another that the latter should purchase it with his own funds, taking the title in his name, and that he should thereafter convey it to the first person at an agreed price, no resulting or constructive trust arises.

5. FRAUDS, STATUTE OF—CONTRACTS WITHIN. A contract whereby one person agrees to use his own funds to purchase certain real estate in which the other party to the contract has no interest, taking the title in his own name, and to thereafter convey the property to the other party upon an agreed price, is within the statute of frauds.

6. TRUSTS—CONSTRUCTIVE TRUSTS—"TRUST EX MALEFICIO." A trust *ex maleficio* arises whenever a person acquires the legal title to property of another by means of an intentional false or fraudulent verbal promise to hold the same for a certain purpose, and, having thus obtained the title, retains and claims the property as his own.

7. SAME—CREATION. A verbal contract was entered into between a person who was both the legal and equitable owner of certain real estate, subject only to a mortgage, and another who agreed to bid in the property on foreclosure sale, obtain a sheriff's deed therefor, and thereafter to convey the title to the owner for a certain sum, relying upon which agreement the owner failed to make an appearance at the foreclosure sale, whereby the land was bid in by the other party to the agreement for about one-third of its value. Before such person received the sheriff's deed, and within the period within which the property could have been redeemed, the owner paid to such person a portion of the price which he was to pay, which was received and applied on the amount to be paid as a prerequisite to the conveyance of the title. After obtaining title such person asserted his ownership to the property, and refused to convey it according to the agreement. *Held*, that a trust *ex maleficio* arose, enforceable though the contract was not in writing as required by the statute of frauds.

8. VENDOR AND PURCHASER—RIGHTS OF PURCHASER—BONA FIDE PURCHASERS—NOTICE. A purchaser of property from a party holding the legal title in trust for another, with notice of the existence of the trust, is in no better position to assert title than the person from whom he purchased.

9. TRUSTS—ESTABLISHMENT—PROCEEDINGS—JUDGMENT. Where, in an action to adjudge, the holder of the legal title to certain property a trustee for the benefit of another, the evidence showed the existence of a trust *ex maleficio*, the fact that plaintiff based her right to recover by demanding by her pleadings the specific performance of an oral contract by the defendant's vendor to convey the property to her for a certain sum, though the mortgage indebtedness against the property, which defendant's vendor removed, was more than twice such sum, and though it would be inequitable and unjust to defendant to compel the reconveyance of the property by defendant to plaintiff for the contract sum, did not preclude plaintiff from obtaining relief, as the relief granted by equity, where a trust *ex maleficio* is raised, is not founded on the specific performance of an oral contract, but upon the principle that equity curns the fraudulent procurer of the legal title into a trustee, and, by raising such a trust by con-

34 Utah—4

struction, can do equal and complete justice between the parties; and hence, where the conveyance of the property upon the payment of the contract sum would be inequitable, it will order a reconveyance upon such terms as are equitable, and will protect the rights of the person defrauded.

APPEAL from District Court, Fourth District; J. E. Booth, Judge.

Action by Asenath Chadwick against John H. Arnold and another. From a judgment for defendants, plaintiff appeals.

REVERSED AND REMANDED WITH DIRECTIONS.

*M. M. Warner* for appellant.

*D. D. Houtz* for respondents.

### APPELLANT'S POINTS.

Acquiring property by fraud creates a constructive trust. (*Laemon v. Knight,* 33 Am. St. 229; *Catilina v. Catilina,* 19 Am. St. 73; 1 Perry on Trusts (4 Ed.), secs. 168, 169, 170, 171, 176; *Miller v. Pearce,* 6 Watts & S. P. 97; Bispham's Principles of Equity (4 Ed.), secs. 91, 218.)

The statute of frauds is no obstacle in the way of proof of an actual or constructive fraud. (1 Perry on Trusts (4 Ed.), sec. 226. Bispham's Principles of Equity, sec. 218.)

Parol evidence is admissible to establish a constructive trust. The statute of frauds is not made to protect fraud. (1 Perry on Trusts, sec. 226; Bispham's Principles of Equity, sec. 218.)

### STRAUP, J.

This is an action in equity in which the plaintiff seeks a decree adjudging that the defendants hold certain real estate in trust for her use and benefit. The substance of the allegations of the complaint is that the plaintiff, the owner of the real estate, mortgaged it to the wife of the defendant, Arn-

old; that thereafter Arnold verbally agreed to purchase the mortgage, bid the property in at foreclosure sale, and agreed to convey the title of the property to her for the sum of $2,-500 after he obtained a sheriff's deed; that, relying on his promise, she made no appearance in the action brought to foreclose, and made no effort to redeem the property within the statutory period of redemption; and that, in pursuance of the agreement, she made partial payments to Arnold, and after the property was sold at foreclosure sale, and after Arnold obtained the sheriff's deed, she tendered him the balance of the $2,500, but he refused to reconvey the property to her, claiming the property as his own, and sold it to the defendant Emert, who purchased it with notice of her claim of interest. She prayed that the defendants be required to convey the property to her upon the payment of the unpaid balance of $2,500, or, if specific performance of the contract be denied, that she be permitted to redeem the premises from the foreclosure sale. The court rendered judgment in favor of defendants, quieting the title in the defendant Emert and dismissing the action against Arnold, without prejudice to another action to adjudicate the monetary transactions had between plaintiff and Arnold. The plaintiff appeals, assailing the findings and conclusions.

At the trial the plaintiff gave evidence tending to show that on September 24, 1900, she was both the legal and equitable owner of the real estate in question. On that day she gave a mortgage on the real estate to Eliza Arnold, wife of defendant Arnold, to secure the payment of a promissory note in the sum of $4,200, with interest at 8 per cent. per annum. Arnold and his wife did not live together harmoniously, and, for three or four years prior to July, 1904, the defendant Arnold lived at plaintiff's place, as she said "throughout the day, and ate his meals there most of the time." They were then very friendly, and had more or less business transactions together. After the mortgage became due, Arnold told plaintiff that he thought he could make a deal with his wife to buy the mortgage by trading his farm where his wife lived for the mortgage and some cattle owned

by his wife, and that if the plaintiff would pay him $2,500 he would come out even, and that was all he cared for; and that he would bid in the place and give her a deed for it. Arnold thereupon obtained an assignment of the mortgage. In the meantime suit had been commenced to foreclose the mortgage. Arnold had himself substituted as party plaintiff in the action. He told Mrs. Chadwick not to appear in the foreclosure action, and that when the sheriff gave him a deed the plaintiff could pay him $2,500 and he would deed the property back to her, and that she could have a year or two after the sheriff's deed in which to pay the money. The mortgage was assigned to Arnold in November, 1902. On November 10, 1903, he obtained a judgment against the plaintiff in the sum of $4,250, $825 interest, and costs, and obtained the usual order for a sale of the premises. The property was sold on foreclosure sale January 12, 1904, and was bid in by Arnold for the sum of $5,100. The sheriff's deed was issued to him July 14, 1904. The plaintiff continued to reside on the premises until August, 1905, when she was dispossessed by order of the court. The plaintiff, relying upon the representations and promise of Arnold, made no appearance in the foreclosure suit, and made no effort to redeem the property within the statutory period of redemption. In April, 1904, and before the sheriff's deed was issued to Arnold, and within the period of redemption, she paid Arnold the sum of $575 as part payment of the $2,500, receipt of which was acknowledged by him as follows: "Vernal, Utah, April 28, 1904. Received of Mrs. Asenath Chadwick, five hundred and seventy-five ($575) dollars paid on the Home Farm. John Arnold." The evidence shows that by the expression "Home Farm" was meant the premises in question. Plaintiff also testified that she paid him additional sums of money amounting to $110, and that he was also indebted to her in the sum of $296 for pasturage, which amount, it was agreed, should also be credited on the $2,500. After Arnold got the sheriff's deed, plaintiff tendered him the further sum of $2,250 and demanded a reconveyance of the property, but he refused to make the conveyance. He sold the property

to the defendant Emert for the sum of $5,250. Plaintiff had owned the farm and resided on it for more than twenty years, and was in possession of it until she was evicted in August, 1905. She testified that the land, 155 acres, was worth $100 per acre. The evidence further shows that Emert, when he purchased the property, had actual knowledge of plaintiff's claim of interest, but he thought he was not chargeable with such knowledge, because such interest did not appear upon the abstract of title, and that he thought he was bound to take notice only of what did appear of record. Plaintiff further testified, in effect, that she was able and willing to redeem the property sold under foreclosure, and would have done so had it not been for the promise and oral agreement of Arnold.

The testimony of the defendant Arnold in some respects differs from that of plaintiff, but from his own testimony it is quite clear that there was some sort of agreement between himself and the plaintiff concerning the acquiring of the title and reconveying it to the plaintiff. In this regard he testified: "Q. Now, then, Mr. Arnold, did you ever, at any time, have any conversation with Mrs. Chadwick in regard to selling or reconveying the place to her? And, if so, what was that conversation? A. She asked me if I would take $2,500, and I said 'yes.' . . . It was some time in January—the last days in January or the first days in February after the sale of the property, I think, or after the sheriff's sale. I think a few days after that, the same month. . . . She asked me if I would take $2,500 down and let them keep the place; if they would pay me $2,500 down and let them keep it. . . . She says, 'I can pay you $2,500 down.' She says, 'Will you take it if I'll pay you $2,500 down; and we can pay you the rest out of this wood contract?' I says, 'yes.'" The material difference between their testimony is that plaintiff claimed Arnold agreed before the mortgage was foreclosed to bid it in and reconvey it after he got the sheriff's deed for the sum of $2,500, while he claimed the agreement was made about the time or shortly after the foreclosure sale, but within the statutory period of redemp-

tion, upon the payment of $2,500 down and the balance to be paid out of a wood contract. Arnold further denied that the receipt referred to was signed by him. He admitted having received the money, but claimed that it was paid on account of other transactions. The receipt was strong corroborative evidence of plaintiff's claim. Its actual signing and execution by Arnold was testified to by plaintiff and two other witnesses. Two other wholly disinterested witnesses—a justice of the peace and Arnold's attorney, who represented him in the justice's court—testified that, in a prior suit before the justice's court, when the receipt was exhibited to Arnold, he then testified that the signature was his signature. Two other witnesses testified that the signature was in his handwriting. Against all this stands the mere denial of Arnold that it was his signature. His testimony also in other particulars differs from that of the plaintiff.

Though from all the evidence in the case it clearly appeared that some kind of an agreement was entered into between plaintiff and Arnold with respect to Arnold's acquiring the title and reconveying it to plaintiff, nevertheless the court wholly failed to find what the terms of the agreement were, or any of the facts or circumstances surrounding the making of it. Instead of making such findings, the court found as follows: "The evidence is insufficient to warrant any finding that the defendant J. H. Arnold and plaintiff ever entered into any agreement respecting the said land, or whereby the said Arnold ever obligated himself to convey or restore said premises or property to plaintiff for any sum or amount whatever, or that there was any contract at all entered into such as could be enforced. The court further finds that the contract, such as the plaintiff claims exists, would, if existing, come within the inhibition of the statute of frauds, and no part performance is either pleaded or proven." It is, of course, apparent that such a finding is not a finding of facts, but a statement of mere conclusions. If the court was of the opinion that the evidence was insufficient to establish the facts and transactions alleged in the complaint, the court ought to have found them against

the plaintiff, for on her was the burden of establishing them. If, on the contrary, the court was of the opinion that such facts were established, but that they showed a contract which was ineffectual because of the statute of frauds, the court, nevertheless, should have found the facts, and then, by way of conclusions, should have declared their effect. That is to say, the court should have separately found whatever the facts were respecting the transactions alleged in the complaint, and upon them should then have separately made its conclusions of law. The statute very plainly requires that "the facts found and the conclusions of law must be separately stated." Section 3169, Rev. St. 1898. This the court failed to do. The effect of the court's finding is that no contract existed between plaintiff and Arnold which was enforceable. Not only is the finding open to the objection that findings and conclusions are not separately stated, but it is open to the further objection that it is not a finding of facts, but mere conclusions. The court did not find whether the verbal agreement and transactions were as testified to by plaintiff or as testified to by Arnold. That there was an agreement between them respecting the transactions is, however, testified to by both of them and not denied by any one. The material difference in their testimony is as to the amount of money that the plaintiff was required to pay, and as to the value of the property. The court also found: "No knowledge or notice, actual or constructive, was ever received or had by the defendant A. C. Emert that the plaintiff claimed an interest in the said premises." From the findings, or, rather, conclusions of law, it is apparent that the court determined the case on the theory that the parol agreement, as testified to by plaintiff, was within the statute of frauds, and for that reason ineffectual, and that Emert was an innocent purchaser for value. We think the evidence clearly shows that Emert purchased with actual knowledge of plaintiff's claim of interest in the premises, and that the finding which the court made in that regard was contrary to the evidence, and for that reason, erroneous.

This brings us to the real question in the case: Whether

the statute of frauds applies to such a case as testified to by the plaintiff. It, of course, is readily conceded that a mere oral agreement to purchase land from another is within the statute of frauds. So, to, it is conceded that if A., having no interest in the real estate, orally agrees with B. that the latter should purchase it with his own funds and take the title in his own name, and that he should thereafter convey it to A. upon an agreed price, no resulting or constructive trust arises, and that such a contract is also within the statute of frauds. The doctrine, however, is quite generally accepted that a trust *ex malficio* arises whenever a person acquires the legal title to property of another by means of an intentional false or fraudulent verbal promise to hold the same for a certain purpose, and, having thus obtained the title, retains and claims the property as his own. The doctrine is well stated in volume 3, Pom. Eq. Jur. (3d Ed.), section 1055, as follows:

"A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose—as, for example, a promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like—and having thus fraudulently obtained the title, he retains, uses, and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement."

And in section 1056:

"The foregoing cases should be carefully distinguished from those in which there is a mere verbal promise to purchase and convey land. In order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the statute of frauds would be virtually abrogated; there must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute; it endeavors to prevent and punish fraud by taking from the wrongdoer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts."

In a note to section 1055 it is said:

"The doctrine is often used with great efficacy to prevent the triumph of fraud, and to protect persons under necessities, in cases where, at execution sale, or mortgage foreclosure, or other compulsory public sale, a party buys in the land under a prior fraudulent promise made to the owner that the purchaser will take the title, hold the property for the benefit of such owner, and will reconvey to him on being repaid the amount advanced for the purchase price; and having thus by fraudulent contrivance cut off competition, and prevented the owner from making other arrangements to protect his property, and having obtained the property perhaps for much less than its real value, he refuses to abide by his verbal promise, and retains the land or other property as absolutely his own. Equity will relieve the defrauded owner by impressing on the property a trust *ex maleficio*, and by treating the purchaser as a trustee *in invitum*."

Mr. Waterman, in his work on Specific Performance of Contracts, at section 252, says:

"A verbal agreement entered into by A. and B. with an execution debtor whose land is about to be sold by the sheriff to purchase it with their own funds and hold it for his benefit is equivalent to a loan of money and a taking of the title as security for its repayment, or an agreement by one person to purchase land for the benefit of another, under circumstances which would amount to a fraud upon the latter, if the former were allowed to repudiate his promise, and therefore is not within the statute of frauds."

And in section 253:

"Where it is verbally agreed between the vendor of land at a judicial sale and the purchaser that the purchaser's rights shall be only those of a mortgagee, and he fraudulently violates the contract by obtaining an absolute deed to himself and selling the land to a third person who has notice of the agreement, the purchaser and his vendee hold the title in trust for the original owner."

With respect to the question when a constructive trust will be created by a court of equity, at section 171, vol. 1, Perry on Trusts (4th Ed.), it is said:

"Thus, where one buys land at an execution sale, or sale under a trust deed, under an agreement with the debtor that the latter may redeem, the purchaser holds in trust; it would be a fraud to allow him to repudiate the contract."

In the case of *Gruhn v. Richardson,* 128 Ill. 178, 21 N. E. 18, it is observed:

"Where one having any interest is induced to confide in the verbal promise of another that he will purchase for the benefit of the former at a sheriff's sale, and in pursuance of this allows him to become the holder of the legal title, a subsequent denial by the latter of the confidence is such a fraud as will convert the purchaser into a trustee *ex maleficio.*"

In support of these texts are the following cases: *Sandfoss v. Jones,* 35 Cal. 481; *Wolford v. Herrington,* 74 Pa. 311, 15 Am. Rep. 548; *Mulholland v. York,* 82 N. C. 510; *Tankard v. Tankard,* 84 N. C. 286; *Avery v. Stewart,* 136 N. C. 437, 48 S. E. 775, 68 L. R. A. 776; *Rose v. Bates,* 12 Mo. 30; *Soggins v. Heard,* 31 Miss. 426; *Dodd v. Wakeman,* 26 N. J. Eq. 484; *Cutler v. Babcock,* 81 Wis. 195, 51 N. W. 420, 29 Am. St. Rep. 882; *Larmon v. Knight,* 140 Ill. 232, 29 N. E. 1116, 33 Am. St. Rep. 229; *Ryan v. Dox,* 34 N. Y. 307, 9 Am. Dec. 696; *Laing v. McKee,* 13 Mich. 124, 87 Am. Dec. 738.

Viewing the case from the standpoint of plaintiff's evidence, it is made to appear that the plaintiff, when the verbal agreement was entered into, was both the legal and equitable owner of the land in controversy, subject only to the mortgage held by Arnold's wife; that Arnold verbally agreed that he would purchase the mortgage, bid in the land on foreclosure sale, obtain a sheriff's deed therefor, and that he would thereafter convey the title to plaintiff for the sum of $2,500; that she, relying upon his promise and representations, failed to make an appearance in the foreclosure suit or to redeem the property from foreclosure sale; that the land, worth more than $15,000, was bid in by Arnold for $5,100, a sum less than the mortgage indebtedness; that before Arnold obtained the sheriff's deed, and within the period in which the property could have been redeemed, plaintiff paid him something like $685 in cash, which was received by him and applied on the agreement; and that the defendant Arnold, after having acquired the sheriff's deed, retained the title, claimed that property as his own, and refused to convey it to plaintiff.

Upon such facts we think a trust *ex maleficio* arose, and that it would be a fraud to allow Arnold to repudiate the contract. In this respect it can be here said as was said by the court in *Avery v. Stewart, supra*:

"If the legal title is obtained by reason of a promise to hold it for another, and the latter, confiding in the purchaser and relying on his promise, is prevented from taking such action in his own behalf as would have secured the benefit of the property to himself, and the promise is made at or before the legal title passes to the nominal purchaser, it would be against equity and good conscience for the latter, under the circumstances to refuse to perform his solemn agreement and to commit so palpable a breach of faith. It would be strange indeed if such conduct is beyond the reach of a court of equity, and if the party who has been grossly deceived and injured by it is without a remedy. The fact that the defendant in this case paid the purchase price out of his own money should not alter the case to the prejudice of his victim."

And as Emert took the property with notice, he is in no better position to assert title and ownership of the property than is Arnold. We therefore think that the finding, or conclusion, of the trial court that the agreement as claimed by plaintiff came within the statute of frauds was erroneous. The foregoing authorities clearly · show that the statute of frauds does not apply to such a case.

It is urged, however, that the plaintiff must recover, if at all, the specific performance of the contract as alleged and testified to by her. That is, it is claimed that the defendants must be required to reconvey to her on the payment of the balance of the $2,500, or not at all, and, since the plaintiff did not dispute owing the full amount of the mortgage indebtedness and had no defense to the foreclosure action, it is said that to compel the defendants to reconvey the property to her for $2,500, when she owed more than twice that amount is inequitable and unjust, and therefore, as the contract which she is seeking to enforce is inequitable, no relief can be granted her. Such a conclusion does not necessarily follow. The relief granted by courts of equity, where a trust *ex maleficio* is raised, is not founded on the specific performance of the oral contract, but upon the principle that equity turns the fraudulent procurer of a legal title into a trustee to get at

him. That is to say, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of the circumstances and relations, and this trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title and order him to hold it for the benefit of the owner or to execute the trust in such manner as to protect the rights of the defrauded party. The rule is well stated in Pomeroy's Equity Jurisprudence, *supra,* that

"Equity does not pretend to enforce verbal promises in the face of the statute; it endeavors to prevent and punish fraud by taking from the wrongdoer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts."

In Bispham's Principles of Equity (7th Ed.), section 218, in speaking of the enforcement of trusts *ex maleficio,* the rule is stated that

"The ground of these decisions is- that the statute of frauds is not to be used as a shield for fraud; and that where a party has, by his promise to buy or hold or dispose of real estate for the benefit of another, induced action or forbearance by reliance upon such promise, it would be a fraud that the promise should not be enforced; and that the method of enforcement will be through the machinery of a trust."

And in the case of *Cutler v. Babcock, supra,* the court said:

"Nor is it necessary to rest the right of the defendant Babcock solely on the power of a court of equity to compel the plaintiff to specifically perform his part of the agreement by conveying the lots in question to the defendant. The relief sought may well be rested on the jurisdiction of the court on the ground of fraud by holding the plaintiff liable to convey as a trustee *ex maleficio.*"

These trusts differ from other trusts in that they are not within the intention or contemplation of the parties at the time the contract is made. They are thrust upon a party contrary to his intention and against his consent. Courts of equity, by raising a trust by construction in cases of fraud, can do equal and complete justice between the parties. When the trust is raised, a court of equity can order the trustee to hold the legal title for the original owner upon just and

proper terms, or to execute the trust in such manner as to protect the rights of the defrauded party. The facts and circumstances as shown by the evidence are sufficient to raise the trust. If, in the execution of it, it is not equitable to compel a reconveyance of the property upon the payment of $2,500, the defendants are not, for that reason, to be permitted to take advantage of their wrong, but should be made to execute the trust upon such terms as are equitable, and as will protect the rights of the plaintiff. We think there is force to the position that, on the record, the defendants should not be compelled to reconvey the property upon the payment of $2,500 less the payments already made by the plaintiff. We think it would be more consistent with equity to require a conveyance upon the payment of the amount of the mortgage indebtedness, less the payments made by the plaintiff, the amount of indebtedness, if any, owing by the defendant Arnold to her, and the rents and profits derived by the defendants from the premises.

We are of the opinion, on the whole of the evidence, that the court erred in holding that the statute of frauds applied to the case, and in finding that Emert was an innocent purchaser. The findings and conclusions of the trial court in that respect are set aside, and the court directed to make findings and conclusions to the effect that the defendants hold the title of the premises in trust for the plaintiff. The case is further remanded to the trial court with directions that an accounting be had between plaintiff and respondents, and that the court especially determine the amount of the mortgage indebtedness, including interest and costs, the payments made by plaintiff to Arnold, and the amount of indebtedness, if any, owing by Arnold to her, and which they had agreed should be credited to her account, the value of the rents and profits since plaintiff's dispossession, and, if necessary, or if either party desires it, to take further evidence on these questions and on the accounting. The court is then directed to deduct from the amount of the mortgage indebtedness, including interest and costs, whatever amount is found to have been paid Arnold by plaintiff, the amount of his indebtedness to

her and which they agreed should be credited to her account, the rents and profits of the premises since plaintiff's dispossession, and whatever other matter is found should be credited to plaintiff on the accounting, and to make findings accordingly. The court is directed to then adjudge that the defendants be required to convey the premises to plaintiff upon her payment to the defendant Emert of the balance so remaining after making such deduction, giving plaintiff six months from the time of re-entry of judgment within which to make such payment; and on her default to make such payment, then she is barred of all right, title, and interest in and to the premises.

The judgment of the court below is therefore reversed, and the case remanded. Appellant is given costs of this appeal.

McCARTY, C. J., concurs.

FRICK, J. (concurring.)

While I concur in the law as the same is stated, and the result reached, by my Brethren, I, nevertheless, feel constrained to add a few words, in view of some of the statements contained in the opinion of Mr. Justice Straup with regard to the testimony in the record. I do this, not because the testimony in the opinion is stated incorrectly, unfairly, or improperly, but because I fear that, in referring to the case hereafter as a precedent, it may be assumed that the conclusions reached in this case were based on certain elements which, in my judgment, are not in the case.

In summing up plaintiff's testimony and the reasons why a trust *ex maleficio* should be declared. Mr. Justice Straup, among other reasons, gives the following: "That the land, worth more than $15,000, was bid in by Arnold for $5,100, a sum less than the mortgage indebtedness." From this—although, no doubt, not so intended—no other inference could be deduced than the one that Mr. Arnold obtained the title to the land for the purpose of reaping a large profit. It is true that Mrs. Chadwick placed such a value upon the land, but the testimony of a number of qualified and disinterested wit-

nesses is to the effect that the value of the land was no more than the amount at which it was bid in at the foreclosure sale. It further appears that after the foreclosure sale the land was publicly advertised for sale for a long time prior to the sale of it to Mr. Emert, and could have been bought at the price paid for it by him. Moreover, the sheriff's sale was open to all bidders, and no one bid more than Mr. Arnold bid for it. If we view the matter of value, therefore, from the standpoint of the witnesses alone, the testimony is overwhelmingly against Mrs. Chadwick. But if we add to this the further circumstance, no court would be justified in finding that Mr. Arnold did not bid in the land at a fair valuation.

It appears that the land was placed in the hands of at least one real estate agent for sale; that he inspected it with a view of setting a price upon it; and that another man, who was a large owner of lands in the vicinity, also inspected it, and was well qualified to express an opinion as to its value, testified that the land was worth not to exceed $5,000, and that he would not pay that sum for it, while the real estate agent testified that it was worth about that amount. In view of these facts, which, to my mind, are conclusive with respect to the value, Mr. Arnold cannot be said to have been actuated in what he did by the expectation of reaping a large profit out of the land; and this feature, therefore, in my judgment, ought not be considered as an element in the case. But, even after eliminating this feature—as Mr. Justice Straup well says—there was at least some kind of an agreement between Mrs. Chadwick and Mr. Arnold with respect to his acquiring the title to the land at the foreclosure sale and its disposition thereafter. What this agreement was the parties to it do not agree, and the court has made no findings respecting its terms and conditions. Taking Mrs. Chadwick's version of it and that of the only other witness who testified in her behalf upon that subject, I was strongly inclined to the view that the agreement amounted to no more than that Mrs. Chadwick should have the right to repurchase the land from Mr. Anrold at the agreed price of $2,500 to be paid for by her with interest from time to time as she was able to do so.

If the agreement amounted to no more than this, and being in parol, it was invalid because within the statute of frauds. This conclusion was deduced, to some extent at least, from the fact that Mrs. Chadwick had absolutely no defense to the note and mortgage, and hence could not have been prejudiced in any way by not appearing in the foreclosure action. Moreover, she said that she was to have the land reconveyed to her free of all incumbrances.

While I have no doubt that Mrs. Chadwick was not misled nor injured by the foreclosure proceedings, nor by the sale thereunder, I am not so clear that she was not misled with regard to her right to redeem the land from foreclosure sale. The majority of this court are firmly of the opinion that in view of all the facts and circumstances a trust *ex maleficio* arose by reason of which Mr. Arnold should be adjudged as holding the land in trust for Mrs. Chadwick. In this regard I feel constrained to yield to their judgment. The judgment of two out of three, where all have equal opportunity to examine and judge of the facts, is, in my judgment, stronger than the judgment of one. Under such circumstances I feel constrained to yield to their judgment. I do so with less hesitancy in this case for the reason that if my judgment, as first conceived, should be wrong, Mrs. Chadwick would be left without redress, while, on the other hand the court may, in its decree, protect the interests of all and do complete justice between them in accordance with the equities in favor of each.