LAWLEY et al. v. HICKENLOOPER et al.

No. 3845. Decided December 26, 1922. Rehearing denied February
9, 1923. (212 Pac. 526.)

1. APPEAL AND ERROR—IN EQUITABLE PROCEEDING, DUTY OF APPEL-
LATE COURT TO EXAMINE RECORD AND WEIGH EVIDENCE. In an
equitable proceeding, it is the duty of the appellate court to
examine the record and determine the weight of the evidence.

2. TRUSTS—EVIDENCE HELD TO ESTABLISH THAT MISREPRESENTA-
TIONS WERE MADE, AND WERE THE INDUCING CAUSE OF A LAND
CONVEYANCE FOR THE BENEFIT OF MINING CORPORATIONS. Evidence
held sufficient to establish that false representations were made
relative to a contemplated coal mining corporation, and that
they were the inducing cause of a conveyance of land to a pro-
motor of the corporation for its benefit.

3. TRUSTS—PROCURING TITLE BY FRAUD OR VIOLATION OF CONFIDEN-
TIAL RELATION CREATES "CONSTRUCTIVE TRUST." Where one pro-
cures the legal title to property from another by fraud or mis-
representation or concealment, or where one makes use of some
influential or confidential relation which he holds toward the
owner of the legal title to obtain such legal title from him upon
more advantageous terms than he could otherwise have obtained,
equity will convert such a one thus obtaining property into a
trustee of a "constructive trust."[1]

[1] *Chadwick* v. *Arnold*, 34 Utah, 48, 95 Pac. 527.

Appeal from Seventh District

4. TRUSTS—EVIDENCE OF MISREPRESENTATION HELD SUFFICIENT TO ESTABLISH GRANTEE OF LANDS A TRUSTEE FOR GRANTORS. Evidence of misrepresentations, made by one negotiating for the organization of a coal mining corporation, relative to the amount which he and others would invest in the management of the corporation, *held* sufficient to create a constructive trust in favor of the grantors of property conveyed to him for the benefit of the corporation which he later sold.

5. EVIDENCE—COMMON KNOWLEDGE THAT IT IS EXPENSIVE TO DEVELOP COAL PROPERTY. It is common knowledge that it is expensive, and frequently costs many thousand dollars, to develop coal property.

6. VENDOR AND PURCHASER—RECITAL OF GROSSLY INADEQUATE CONSIDERATION IN DEED SUFFICIENT NOTICE TO PURCHASER OF INFIRMITIES OF GRANTOR'S TITLE. A nominal or grossly inadequate consideration recited in a deed is a sufficient circumstance for a reasonable time after such deed is made and recorded to put a purchaser on inquiry into the nature of the title of the grantor or the rights and equities of a former owner.

7. TRUSTS—RECITAL OF CONSIDERATION OF $10 IN A DEED TO PROPERTY WORTH $7,500 AND OTHER FACTS HELD NOTICE TO PURCHASER OF INFIRMITIES IN TITLE. The recital of a consideration of $10 in deed to H. of property worth $7,500, the fact that the deed carried revenue stamps indicating a consideration not to exceed $500, and that the land was still occupied by tenants of the original grantor who lived in the same town, was sufficient to put a purchaser from H. upon inquiry, and constituted constructive notice of the fact that H. held the property in trust for the original grantors.

8. TRUSTS—DELAY IN ASSERTING RIGHTS IN REALTY UNDER CONSTRUCTIVE TRUST HELD TO PRECLUDE RECOVERY AGAINST SUBSEQUENT OWNERS. Where a person, who had conveyed land to another after such misrepresentations that a constructive trust resulted in his favor, had knowledge that his grantee, the trustee, had again conveyed the property, and did not for more than two years thereafter bring any action to compel reconveyance or establish his rights, *held* that he was not entitled to relief as against subsequent grantees having no knowledge of any charge upon the property.[2]

[2] *Jones Min. Co.* v. *Cardiff M. & M. Co.*, 56 Utah, 449, 191 Pac. 426.

Appeal from District Court, Seventh District, Carbon County; *F. E. Woods*, Judge.

Action by W. H. Lawley and another against W. A. Hickenlooper and one Sheya and others. From judgment for defendant, plaintiffs appeal.

REVERSED as to the named defendants, and AFFIRMED as to the others.

*F. W. James* and *H. L. Mulliner*, both of Salt Lake City, for appellants.

*L. A. McGee*, of Price, and *Jeremiah Stokes*, of Salt Lake City, for respondents.

GIDEON, J.

This is an equitable proceeding in which appellants, plaintiffs below, seek to establish that each respondent except W. A. Hickenlooper holds certain real property in trust. The prayer of the complaint is that the respondents be declared to hold title to the real property vested in each respectively for appellants, and directed to convey the same to appellants free of any claims of respondents or their grantors. Appellants ask that if for any reason the property cannot be restored to them the respondents and each of them who have conveyed or disposed of said property with knowledge shall account for the value of the property so conveyed; that if, for any reason, any of said respondents have acquired any of such property in good faith and for value, and not as trustee for appellants, the said property shall be restored to the appellants upon their paying to the respondents the amounts of money, if any, so invested. Appellants also pray for general relief. In addition, they ask for a money judgment against respondents Hickenlooper and Sheya.

A joint answer was interposed by all of the respondents save Hickenlooper, in which it is alleged that Hickenlooper

received title to the property in controversy on or about April 5, 1918, from the appellants; that Sheya subsequently acquired title to said property from Hickenlooper, and paid therefor a valuable consideration without notice of any claim of trust relationship between respondent Hickenlooper and appellants if any such relation existed. Sheya and his co-respondents claim ownership of the respective properties held by them. They allege that they purchased the same in good faith for valuable considerations, without notice of any claim on the part of appellants. Respondent Hickenlooper filed a separate answer. It is admitted by him that he received title to the real estate in question from appellants. He denies all claim of right on the part of appellants as against the property, himself or his corespondents.

The trial court found the issues in favor of respondents. Judgment was rendered, dismissing appellants' complaint and quieting the title to the premises in the respective respondents. Motion for a new trial was made and denied.

The assignments of error assail the findings of fact as well as the court's conclusions of law and judgment. This being an equitable proceeding, it is the duty of this court to examine the record and determine the weight of the evidence. There is, however, but little conflict in the evidence. The controversy relates more to the legal rights of the parties than to any dispute of fact.

It appears, as alleged in the complaint, that the appellants owned certain parcels of real estate situate in the town of Price in Carbon county. There were some four or five small residences on this property. These were occupied by tenants. It also appears that the appellant W. H. Lawley owned one-third of the stock in a corporation known as the Helper Coal Company. This company owned certain coal lands situate at or near the town of Helper in Carbon county. Some development work had been done upon this property prior to 1918. Two-thirds of the stock of the Helper Company was held by others, referred to in the record as "the interests of certain Greeks." The respondent Hickenlooper procured an option to purchase this two-thirds

interest. In January of 1918 Hickenlooper was introduced to appellants. What took place at the first meeting is not very clearly shown, but it sufficiently appears that some overtures were made to purchase appellants' interest in the corporation and the land owned by it. Appellant W. H. Lawley is a coal miner, and had worked in the coal mines in the county a great many years, and was familiar with the coal lands in that vicinity. He did not desire to sell, and no agreement was made at that time. Other meetings were held in February and March following.

The ground for relief stated in the complaint is that at these several meetings Hickenlooper stated and represented to appellants that he was possessed of or had approximately $10,000, which he would invest in the development of this coal property; that he had interested others who would subscribe for stock or invest in the enterprise various amounts ranging from $1,000 or $2,000 to $5,000, making the total amount of money available for the development of the mine approximately $30,000. It is also claimed, and the testimony tends to prove it, that Hickenlooper represented, and stated that he had interested a Mr. Pettit and a Mr. Lloyd, and that they would invest in the enterprise. It seems that the appellants had known Mr. Pettit personally for a number of years, and had implicit confidence in his ability and integrity in the particular line of work in which they were embarking. They also knew Mr. Lloyd by reputation, and knew him to be a business man of standing in the state. It is alleged in the complaint, and supported by the testimony of appellants and others, that they were induced by these representations to make the conveyance of the real property; that otherwise they would not have so conveyed the property. Carrying out the agreement or understanding verbally entered into between Hickenlooper and appellants, on the 5th day of April, 1918, the appellants executed two warranty deeds, conveying all of their title in and to the property in question to the respondent Hickenlooper. At the same time Hickenlooper conveyed certain property owned by him to the Lawleys. It was understood that the property

conveyed to Hickenlooper, as well as the property conveyed to appellants by Hickenlooper, should be conveyed to a corporation to be organized to develop the coal property. The corporation was subsequently organized, and articles were filed with the Secretary of State on or about May 28, 1918. This company is known as the Inland Fuel Company. The appellants conveyed the property received from Hickenlooper to the corporation. The property conveyed by appellants to Hickenlooper was not conveyed to the corporation. The fuel company functioned actively for probably eight weeks. On or about June 1, 1918, respondent Hickenlooper mortgaged the premises conveyed to him to one Fisk for $2,500. The money received upon this mortgage was used first to satisfy a prior and subsisting mortgage on the same property held by the same mortgagee, upon which there was an unpaid balance of about $1,100, second, to satisfy a judgment for $290 against Lawley, which was also a lien upon this real property. A further sum of $220 was retained by the mortgagee to be expended in repainting the houses located upon the premises. Subsequently, on June 10, 1918, Hickenlooper, by warranty deed conveyed the property to the respondent Sheya subject to the mortgage. The other respondents acquired certain parts of the realty by deeds from Sheya.

Appellants claim that they were induced to convey title to the respondent Hickenlooper by reason of the representations made by him, and that, relying upon these representations, they made the conveyances as alleged in the complaint; that the representations so made were not true. It is the theory of appellants that under this state of facts Hickenlooper held title to the property as trustee for them; that the remaining respondents had notice of appellants' claim, and therefore took title burdened with a like trust.

That Hickenlooper made the representations claimed by appellants, in our judgment, is abundantly supported by the record. That the appellants relied upon such representations and were thereby induced to make the conveyance is likewise supported. The appellant W. H. Lawley and his

wife, and another member of his family, positively testified
that such representations were made. The testimony of
Hickenlooper himself corroborates the claim of appellants
that some representations were made. In the limits of this
opinion it would be impracticable to state in detail the tes-
timony of the several witnesses bearing upon this issue. It
will be sufficient to refer briefly to the testimony of the
respondent Hickenlooper on cross-examination re-        2
specting what representations he made to the appel-
lants. He testified as follows:

"Q. You laid plans for the development of the mine? A. Yes,
sir. Q. How were you going to develop it? A. Well, I was sub-
scribing for $8,000 worth of stock myself. Q. You told Mr. Lawley
that? A. Yes; that I would dispose of certain property that I had,
and I thought I would be able to put that in. Q. Put in $8,000
yourself? A. Yes, sir. Then he put in the houses, the Price prop-
erty here, and that helped that much. I also put in the Weber Ho-
tel at Coalville, which we were to dispose of and use the proceeds
for development of the property. Then it was determined that we
would undertake to raise certain other funds, whatever might be
necessary, from the sale of small blocks of stock, $100 here and $100
there, which I was opposed to, but in a way taking part in it if you
might call it that. Q. Did you say anything to him about people
subscribing for blocks of $1,000 or more? A. Yes, sir. Q. What
did you tell him about that? A. I told him that I thought that
Mr. Pettit might put in $1,000, which Mr. Pettit had told me he
thought he might do, though he had not promised, and I did not
promise Lawley that he would. Q. Did you mention to Lawley
about Pettit thinking of putting in $1,000? A. Yes, sir. Q. What
else did you tell him about that? A. I told him that I had a friend
that might put in $5,000. He had talked about it, but he didn't
know for sure. Q. What friend was this? A. E. C. Olson, of
Ogden. I didn't mention the name, but that is the name. Q.
Didn't you tell him that one of them had enough money to see the
thing through, and you thought that you could get him interested
in this? A. I did not. Q. In this agreement with Lawley you
were to finance the corporation, wasn't you? A. Not wholly. I
was to do the larger part of that. Q. You had also made arrange-
ments to open the mine, the coal mine? A. I anticipated doing
that. Q. Did you say anything about Mr. Pettit being superintend-
ent of the coal company? A. Yes, sir. Q. What did you tell him?
A. I said that I had asked Pettit if he would come in and be gen-
eral superintendent and take charge in particular of the Coalville
property if we obtained enough funds to develop the Coalville prop-

erty. Q. What else did you tell him? A. About Mr. Pettit? Q. Yes. A. Nothing. Q. Did you tell him what Pettit said in reply? A. I told him that Mr. Pettit appeared to be favorably inclined. Q. Did you tell him whether Mr. Pettit said anything? A. I told him that I had talked with Mr. Pettit about it. Q. What did you tell Mr. Lawley that Mr. Pettit had said about it? A. No; I told him that no definite arrangements had been made; that it was simply in contemplation. Q. What did you tell Mr. Lawley that Mr. Pettit said? A. I think I told Mr. Lawley that Mr. Pettit said he might be interested in doing that."

Mr. Pettit's testimony is that he at no time agreed or promised to invest any money in the enterprise.

It is contended that Mr. Hickenlooper, as shown by the testimony, actually expended of his own means approximately the amount of money that he had agreed to contribute personally to the development of this coal property. The testimony offered in support of that claim is not entitled to much weight. No part of the money ever found its way into the treasury of the fuel company. No record is produced showing the expenditure of any such amount. No check or bank account seems to have been kept of the distribution of such fund. No satisfactory or probable explanation is in the record as to just how or for what purpose such amount was expended.

The court found, at least inferentially, that representations were made to appellants by Hickenlooper as claimed. In its twelfth finding the court found that neither Lloyd nor Pettit had the sum of $2,000 to invest in the capital stock of the fuel company, but also found that the statements or representations of Hickenlooper were not the inducing cause which led appellants to make the conveyance to Hickenlooper. We are unable to agree with the conclusion in that finding that those representations were not the inducing cause. Such seems to be contrary to the evidence. This court is of the opinion that the great weight of the evidence—in fact, almost the undisputed testimony—supports the allegations of the complaint that those representations were the real moving cause that induced the appellants to make the conveyance to Hickenlooper, and that such representations were not supported by the facts. It now re-

mains to be determined what relationship was thereby created between appellants and Hickenlooper respecting the title to the property in controversy.

It is appellants' contention that it created a relationship of trust so long as Hickenlooper held the title in his name, and that that relationship followed the property into the hands of any one charged with notice either actual or constructive, of appellants' rights in the property.

A definition of a constructive trust and a statement of the facts out of which such a trust is created are found clearly stated in 1 Perry on Trusts and Trustees (6th Ed.) § 166, as follows:

"Thus, if one party procures the legal title to property from another by fraud or misrepresentation or concealment, or if a party makes use of such influential or confidential relation which he holds towards the owner of the legal title, to obtain such legal title from him upon more advantageous terms than he could otherwise have obtained it, equity will convert such party thus obtaining property into a trustee. If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party, and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. Such trusts are called constructive trusts."

The same principle is enunciated in almost the same language in 3 Pomeroy Eq. Jur. (4th Ed.) § 1044.

The second headnote to *Henderson* v. *Murray*, 108 Minn. 76, 121 N. W. 214, 133 Am. St. Rep. 412, announces the same general principle as follows:

"Where, however, a party obtains the legal title to land from another by fraud, or by taking advantage of confidential or fiduciary relations, or in any other unconscientious manner, so that he cannot justly retain the property, equity will impress a constructive trust upon it in favor of the party who is equitably entitled to it."

This general equitable principle is recognized by all the authorities. This court is committed to it. See *Chadwick* v. *Arnold*, 34 Utah, 48, 95 Pac. 527. See, also, 39 Cyc. 172 et seq.; *Pollard* v. *McKenney*, 69 Neb. 742, 96 N. W. 679, 101 N. W. 9.

Applying this general principle to the facts in the instant case, we see no escape from the conclusion that the respondent Hickenlooper held title to these premises in trust for appellants, and that any one receiving title from him charged with either actual or constructive notice would bear the same relation to appellants as did the respondent Hickenlooper.

It is, however, argued by counsel for respondents that the property was conveyed to Hickenlooper in trust to be conveyed to a corporation to be thereafter organized; that the trust was substantially complied with by using the proceeds received from the mortgage and sale in paying the obligations of the fuel company, and that appellants for such reason have no just ground of complaint. If it be admitted that the testimony establishes (which we do not think it does) that the proceeds were paid to the fuel company, that does not answer the claim of appellants that they were induced to and did convey this property upon the representations that Hickenlooper had ready to and would invest $10,-000 of his own funds, and that others would invest as much as was necessary to develop the coal property. The moving purpose of appellants was to contribute to the success of opening up the coal mine. It is a matter of common knowledge that it is expensive, and frequently costs many thousand dollars to develop coal property in that vicinity. The representations relied on by appellants were that sufficient money had been acquired, or could be acquired to accomplish that purpose, and when it was ascertained that these representations were not founded in fact, then the consideration and the moving cause had failed, and the appellants were entitled to have their property restored to them. It was not contemplated by any of the parties that the amount of money that could be received for the

equity the appellants had in the real estate conveyed by them was sufficient to raise the necessary money to develop the coal mine. If there had been no other representations than that this property should be used in developing this coal property, then there might be some merit to counsel's contention. But, as indicated, that was not the moving cause.

It remains to be determined whether the respondent Sheya and the other respondents are bona fide purchasers for value without notice of the appellants' rights. There are certain general rules respecting notice recognized by all the cases and text-writers that it may be well to state at this point.

In 39 Cyc. 1703, it is said:

"The fact that one pays a valuable consideration for property does not make him an innocent purchaser if he had knowledge of outstanding equities of third persons.

"Notice to affect purchasers for value with charges on property purchased may be actual or constructive. There is conflict in the cases and among writers as to what is actual notice, but as actual and constructive notice are the same in effect, it is immaterial what kind of notice is received by the purchaser."

On page 708 of the same volume it is further said:

"Notice which will charge a purchaser of land with notice of fraud is the knowledge of any facts that would inform him of the fraudulent intent, or that would put a person of ordinary prudence on inquiry as to such fraudulent intent, where it appears with reasonable certainty that such inquiry would result in a discovery of the intended fraud."

In *Wood* v. *Carpenter*, 101 U. S. on page 141 (25 L. Ed. 807), Mr. Justice Swayne, writing the opinion of the court, quotes, with approval the following from *Kennedy* v. *Greene*, 3 Myl. & K. 722:

"Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."

Also from Angell on Limitations, § 187, and note, the following:

"The presumption is that, if the party affected by any fraudulent transaction or management might, with ordinary care and atten-

tion, have seasonably detected it, he seasonably had actual knowledge of it."

In 39 Cyc. 1718, the author says:

"Where the contract under which the purchaser buys is sufficient on its face to put him upon inquiry as to what the consideration was, or where it plainly shows that the consideration has not been paid or performed, he is chargeable with notice thereof. A nominal or grossly inadequate consideration recited in a deed is a sufficient circumstance, for a reasonable time after such deed is made and recorded, to put a purchaser on inquiry; but after it has remained of record for some years unquestioned, a person about to purchase under it has a right to conclude that there was no vice in the deed, that a sufficient consideration had in fact been paid, or it would have been attacked within a reasonable time; and he is justified in relying upon it."

See, also, the following authorities: *Hatfield* v. *Lotty*, 48 Okl. 173, 149 Pac. 1171; *Hume* v. *Franzen*, 73 Iowa, 25, 34 N. W. 490; *Kinney* v. *McCall*, 57 Wash. 545, 107 Pac. 385; *Winsted* v. *Shank* (Okl. Sup.) 173 Pac. 1041.

Appellants made the conveyance to respondent Hickenlooper on April 5, 1918. The property so conveyed is located in the town of Price, Carbon county. The respondent Sheya resides there. There were located upon the property some four or five small residences. These were occupied by tenants. The same tenants occupied the property at the time of the conveyance to Sheya that occupied it on April 5th. Dr. Fisk, who held the mortgage on the property, with the consent of the appellants, collected the rents prior to the conveyance to Hickenlooper. He continued to collect the rents until the conveyance to Sheya. The testimony is undisputed that the value of the property at that time was $7,500. The deeds made by the appellants to Hickenlooper name the consideration as the sum of $10. It is also provided in the deeds that the conveyance is made subject to the unpaid portion of a certain mortgage in favor of F. F. Fisk, and the grantee assumed and agreed to pay such mortgage. There is placed upon each of the deeds from the appellants a 50-cent revenue stamp. There is no testimony that the respondent Sheya made any inquiry or investigation to ascertain the rights of the appellants in these premises

further than that he required Hickenlooper to furnish him with an abstract of title. In other words, he apparently relied exclusively on the record title to protect him as purchaser without notice. The question to be determined is whether, under all of the facts and circumstances shown by the record, he can excuse his failure to make any investigation or inquiry and rely wholly upon the record title.

Gross inadequacy of price may be sufficient in itself to bring home to the purchaser notice of the infirmities of his grantor's title. 39 Cyc. 1719.

The fourth headnote to *Dunn* v. *Barnum*, 51 Fed. 355, 2 C. C. A. 265, reads:

"One who receives a deed of bargain and sale conveying lands worth $30,000 for a consideration of $100 must be presumed to know of infirmities in his grantor's title, and cannot claim the protection of the rule in favor of innocent purchasers, as against one holding for value under a prior deed, in the recording of which the land in question was omitted by mistake."

The Supreme Court of Oklahoma, in *Brink* v. *Canfield*, 78 Okla. at page 196, 187 Pac. at page 229, in discussing the duty of the purchaser who relies upon record title, says:

"A purchaser of land, who buys in reliance on the record title, is chargeable with all the notice brought to him by the records; and if the record contains matters that would put a person of ordinary prudence upon inquiry into the nature of the title of the grantor, or of the rights and equities of a former owner, then the law charges such purchaser with all the knowledge an inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him."

"The essential elements which constitute a 'bona fide purchase' are valuable consideration, absence of notice, and the presence of good faith." *Winsted* v. *Shank*, supra.

See, also, *Connecticut Life Ins. Co.* v. *Miller*, 117 Mo. 261, 22 S. W. 623; *Pollard* v. *McKenney*, 69 Neb. 742, 96 N. W. 679, 101 N. W. 9.

The Supreme Court of Arkansas, in *Gaines* v. *Saunders*, 50 Ark. at page 328, 7 S. W. at page 303, in discussing the facts of that case as to whether inadequacy of consideration was notice sufficient to put the purchaser upon inquiry, says:

"The evidence shows that the lands in controversy cost about $6,000, and that there was loaned on them, as security, $2,220. The deed executed by Whitaker to Mrs. Saunders was a quitclaim deed, and was recorded; and it states that the consideration received for the lands was $5. Was not this fact sufficient to put any prudent man on inquiry? Is it possible that any sane man, having good title to land worth $2,000 or $6,000, would sell it for $5? The question suggests its own answer. * * * It was, at least, sufficient to have put appellants on inquiry, which, if they had prosecuted with ordinary diligence, would doubtless have led to actual notice of the facts as shown by the evidence in this case. But they prosecuted no inquiry, and it follows that they are not bona fide purchasers without notice."

Applying the rules of law thus stated to the particular facts shown here, can the respondent Sheya claim to be an innocent purchaser for value without notice? We do not think so. The consideration mentioned in the deeds is $10. The revenue stamps placed upon the deeds indicate that the consideration was not to exceed $500. The land was occupied by tenants who had occupied it while it was owned by appellants. The same agent was collecting the rents. The deed to Hickenlooper bore date two months and five days prior to the date of Sheya's purchase. Certainly such facts were sufficient to put any cautious or prudent person upon inquiry. It is not disputed that the appellants were residents of that county at the time of the purchase of this property. Any inquiry whatever from the appellants would have elicited the information that the respondent Hickenlooper had no right to convey the property to this respondent.

We are of the opinion that the respondent Hickenlooper held the property in trust for appellants, and so hold; that the respondent Sheya took such property with constructive notice of such relationship, and must therefore be held to hold it in like relationship to the appellants.

As to the remaining respondents it appears undisputed by appellants own testimony that they knew from and after June 12, or June 13, 1918, that Hickenlooper had conveyed this property to Sheya. Notwithstanding that fact, no action or suit was brought to cancel the conveyance and have

appellants declared the rightful owners of the property until June 26, 1920. Sheya conveyed to the respondents Golding the interest now claimed by him on November 29, 1918; he conveyed to respondent Warner on February 10, 1919; the respondent Gilland received the conveyance of the property claimed by him on June 18, 1919; and the deed making that conveyance was executed by John C. Ferguson and wife. It does not appear from whom Ferguson obtained the title or the time when he did obtain it. The facts are such that in our judgment, the appellants ought not now to be permitted, in the absence of proof of actual knowledge of their claims, to dispute the titles of these last-named respondents. The appellants had notice that Sheya held the legal title. The courts were open for them to assert their rights in the premises without delay. The institution of an action and the filing of a lis pendens would have been notice to those respondents and to all the world of their claim. Nothing of that kind, however, was done. Many and other elements except the length of time are to be considered in determining whether a court of equity will grant relief against parties who have changed their status or relationship to the matter in controversy by reason of the failure of a claimant to assert his rights at an earlier date. The delay may be the usual period of limitations. It may be much longer or much shorter. No reason is shown why an action was not instituted long prior to the bringing of this suit to determine appellants' rights and to give notice to all that such rights were claimed.

The Supreme Court of Colorado, in *Williams* v. *Woodruff*, 35 Colo. 28, 85 Pac. 90, 5 L. R. A. (N. S.) at page 1000 of the last-named report, quotes with approval the language of the Court of Appeals of that state in *Du Bois* v. *Clark*, 12 Colo. App. 220, 55 Pac. 750, respecting laches, as follows:

"The question ordinarily is whether, during the period of delay, such changes have taken place in the position of parties, relative to the subject-matter of the litigation, as to render it inequitable to permit the enforcement of the rights, concerning which otherwise there might be no difficulty. If, while the injured party is unneces-

sarily inactive, * * * the other party, on the faith of an apparent situation, the reality of which he had no reason to doubt, has so changed his position that, if existing conditions were disturbed, he would suffer injury, the delay is chargeable as laches, and, in equity the consequence of the laches is the loss of the remedy."

See, also, *Jones Min. Co.* v. *Cardiff M. & M. Co.,* 56 Utah, 449, 191 Pac. 426; *Hammond* v. *Hopkins,* 143 U. S. 273, 12 Sup. Ct. 418, 36 L. Ed. 134; *Jenkins' Assignee* v. *Pierce,* 98 Ill. 653.

It should be stated that the respondent Sheya is charged with notice only by reason of the rules of law applicable under the particular facts in this case.

In adjusting the rights of the parties the district court should credit the respondents with all amounts expended in satisfying the mortgage and other lien against the property at the time of the conveyance by appellants and such amounts necessarily expended in improving and repairing the property upon the premises, in short, to take an accounting and do justice between the parties.

The judgment of the district court dismissing the action against the respondents other than Hickenlooper and Sheya is affirmed. As to those two respondents, the judgment is reversed, and the cause is remanded, with directions to determine the rights of the parties in conformity with the views herein expressed. Costs on appeal are awarded to appellants.

CORFMAN, C. J., and WEBER, THURMAN, and FRICK, JJ., concur.